J-A19015-17

2018 PA Super 36

| NICHOLAS MURRAY | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON; JANSSEN RESEARCH & DEVELOPMENT, LLC; EXCERPTA MEDICA, INC.; AND ELSEVIER, INC. | |
| APPEAL OF: JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON; AND JANSSEN RESEARCH AND DEVELOPMENT, LLC | No. 1172 EDA 2016 |

Appeal from the Judgment Entered March 10, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): April Term, 2013, No. 1990

| NICHOLAS MURRAY, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellant | |
| v. | |
| JANSSEN PHARMACEUTICALS, INC.; JOHNSON & JOHNSON; AND JANSSEN RESEARCH & DEVELOPMENT, LLC; EXCERPTA MEDICA, INC.; AND ELSEVIER, INC. | |
| Appellees | No. 1302 EDA 2016 |

Appeal from the Judgment Entered March 10, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): April Term, 2013-No. 1990

BEFORE: BENDER, P.J.E., DUBOW, J., and MUSMANNO, J.

OPINION BY BENDER, P.J.E.: **FILED FEBRUARY 20, 2018**

Appellants/Cross-Appellees, Janssen Pharmaceuticals, Inc., Johnson & Johnson, and Janssen Research & Development, LLC (collectively referred to herein as "Janssen"),[1] appeal and Appellee/Cross-Appellant, Nicholas Murray, cross-appeals from the March 10, 2016 judgment entered in favor of Mr. Murray following a jury trial. We affirm in part, reverse in part, and remand for further proceedings.

Mr. Murray, a resident of Maryland, filed this action against Janssen in the Philadelphia County Court of Common Pleas, asserting, *inter alia*, that he developed gynecomastia — a condition where female breast tissue grows in males — as a result of using Janssen's drug, Risperdal.[2] He further alleged that Janssen negligently failed to warn physicians and health care providers of the risk of gynecomastia associated with Risperdal use. Mr. Murray's case was coordinated in Philadelphia's Complex Litigation Center as a member case in the mass tort program captioned **In re Risperdal® Litigation**, March Term 2010, No. 296. All of the cases in this mass tort action consist of male plaintiffs who allege they developed gynecomastia due to their Risperdal use.

The trial court summarized the facts adduced at the jury trial as follows:

---

[1] Janssen Pharmaceuticals, Inc. and Janssen Research & Development, LLC, are wholly owned companies of Johnson & Johnson. **See** Trial Court Opinion (TCO), 3/10/2016, at 1.

[2] According to the trial court, "Risperdal is the trade name for the generic drug risperidone." TCO at 1 n.2.

[Mr. Murray], who is now twenty-one years old, was administered Risperdal by several of his treating pediatricians, namely, Mark Langfitt, M.D., and Arvoranee Pinit, M.D., beginning in April of 2003 and terminating at the request of [Mr. Murray's] mother[, referred to herein as Mrs. Murray,] on or about February of 2008. This drug was recommended by psychologist Richard Greenbaum, Ph.D., whom Dr. Langfitt had consulted because [Mr. Murray] had difficulty sleeping, most probably arising from what [Janssen's] expert, pediatric psychiatrist, Nadine Schwartz, termed "autism spectrum disorder." The drug was prescribed for [Mr. Murray] "off-label." It was not approved for pediatric use by the [Food and Drug Administration (FDA)] until 2006, and then only for use with "irritability arising from autism."

Risperdal was approved by the FDA for schizophrenia in adults in the 1990s but was used off-label for pediatric patients until it was finally approved by the FDA in 2006. Although the drug is effective in treating certain mental health disorders, it has the propensity to create a hormonal imbalance in patients by increasing the levels of the hormone prolactin. This increase in prolactin levels can lead to what is termed hyperprolactinemia. In turn, this condition can lead to the development of breast tissue in males, termed gynecomastia.

It was undisputed that Janssen knew and was concerned about the fact that Risperdal could, by raising prolactin levels, lead to gynecomastia. They undertook studies to determine the relationship between hyperprolactinemia and gynecomastia prior to and during the time period [Mr. Murray] consumed the drug. [Mr. Murray's] counsel asserted that Janssen both knew about and encouraged the off-label use of Risperdal for children and adolescents, but failed to notify physicians, health care providers, or the FDA of the significant risk of gynecomastia that Janssen's own studies revealed. [Mr. Murray's] counsel pointed to a 2003 study commissioned and published by [Janssen], referred to at trial as the "Findling article" after the name of its lead author, who addressed long-term Risperidone treatment in children and adolescents. The final published version of the article concluded that there was no significant correlation between high prolactin levels and gynecomastia after taking Risperdal. Certain draft articles, however, referenced studies showing that during 8-12 weeks of use there was a high correlation between side effects and higher than normal prolactin levels. These studies showed that 7.8% of the children tested who suffered prolactin related side effects, including gynecomastia, had higher than normal

prolactin levels as opposed to 2.9% of those with normal levels. This study did not appear in the final published article. It was argued at trial that the 8-12 week study should have been included in the article and the failure to do so indicated that [Janssen] knew of a significant risk but failed to inform the public. In addition, [Mr. Murray] presented a pooled study comprised of five separate studies undertaken by [Janssen]. One of these studies was an international study termed "INT-41[,]" … which showed that after one year of use 24 out of 504, or 4.8%, of patients on Risperdal suffered from gynecomastia.

[Mr. Murray's] counsel, through its expert, David M. Kessler, M.D., also cited other studies indicating that [Janssen] knew that there was a significant risk of gynecomastia in male children and adolescents but failed to warn healthcare providers. Dr. Kessler asserted that the data submitted to the FDA was done so by Janssen in such a fashion as to diminish the risk of gynecomastia.

Dr. Kessler also argued that the information contained in the Rispersal [sic] label vastly understated the risk. Two labels were at issue: one from 2002 and another from 2006. The 2002 label stated that there were insufficient studies concerning the effects of the use of Risperdal in children and adolescents. This label provided that gynecomastia was a "rare" side effect, which is defined by the FDA as something that occurs in 1 in every 1,000 cases. The label also stated that Risperdal did not increase prolactin any greater than other antipsychotic drugs in its class. Dr. Kessler argued that the risk was actually much greater than this, and he alleged that [Janssen] knew much more about the risk of gynecomastia arising from use of Risperdal than what was contained in the label. As a result of the Findling draft and the INT-41 study in particular, Dr. Kessler testified that [Janssen] knew that its drug Risperdal increased prolactin levels greater than other drugs in its class and this in turn lead [sic] to a greater risk of gynecomastia in children and adolescents. By contrast[,] the 2006 label, which represented the FDA's approval of the use of Risperdal for children and adolescents suffering from irritability from autism, contained the admonition that Risperdal actually increased the prolactin levels greater than other drugs in its class. The 2006 label also provided that the reported rate of gynecomastia was 2.3% arising from the 1885 participants in the eighteen studies submitted to the FDA by [Janssen]. Dr. Kessler concluded that Janssen knew about this information contained in the 2006 label well before and during the time [Mr. Murray] took the drug. Consequently[,] he concluded that [Janssen] was

negligent in failing to adequately advise physicians/health care providers of the significant risk of gynecomastia arising from the use of Risperdal.

The defense vigorously contested every aspect of [Mr. Murray's] negligence claim. [Janssen] denied that there [was] any significant risk of gynecomastia from the use of Risperdal. It presented testimony from Danielle Coppola, M.D., who had been employed at Janssen since 2005 and who had worked with safety issues involving Risperdal. She opined that when taking into consideration the time period in which the subjects of the studies were on the drug[,] the risk of gynecomastia was minimal. Janssen further denied that the studies cited by [Mr. Murray] indicated that Janssen knew or had reason to know that the risk of gynecomastia was any greater than rare (as indicated in the 2002 label) during the time period [Mr. Murray] took the drug. [Janssen] maintained that the omitted prolactin study contained in the Findling draft and the INT-41 study did not tell the full story. The Findling draft, in what was termed "Table 21[,]" … contained data showing high prolactin levels only at 8-12 weeks of use. Janssen asserted that this data was not included in the final article because it merely showed high prolactin levels over this short period of time. Other studies show that prolactin levels usually rise after initial use of the drug and then diminish over time, and thus this one study involving an 8-12 week time period was irrelevant and insignificant when compared to the overall use of the drug. In addition, the INT-41 study was only one of five contained in the pooled studies. It was also only one of eighteen studies sponsored by Janssen. Analyzing all the studies, and considering the fact that gynecomastia occurs frequently during puberty without the use of Risperdal, [Janssen] argued that [it] had reasonably concluded that gynecomastia was not a significant risk. [It] alleged that the contents of the 2006 label were the result of a culmination of additional studies and did not reflect what was known when [Mr. Murray] was first prescribed the drug. [Janssen] further argued that a risk/benefit analysis indicated that the benefit from the use of Risperdal clearly outweighed any risk of gynecomastia. Despite [Janssen's] contentions[,] the jury, by a vote of eleven to one, decided the issue of negligence in favor of [Mr. Murray].

Causation was hotly contested as well. On this issue of causation, the jury found in favor of [Mr. Murray] by a vote of ten to two. [Mr. Murray's] major witness was Francesco DeLuca, M.D., a pediatric endocrinologist who examined [Mr. Murray's] breasts.

He concluded that [Mr. Murray] suffered from gynecomastia. Critical to this diagnosis was what Dr. DeLuca discovered when he palpated [Mr. Murray's] chest. Dr. DeLuca explained that breast tissue is firm whereas fat tissue is soft; he found [Mr. Murray's] breast tissue to be firm. He supported his conclusion with various photos of [Mr. Murray] that were taken during the time period in [which Mr. Murray] took the drug. Dr. DeLuca also cited to [Mr. Murray's] school, medical, and pharmacy records. He also ruled out other possible causes. In addition, a mammogram performed in November[] 201[4], found firm, dense tissue "suggesting gynecomastia." In consideration of the time period in which [Mr. Murray] ingested the drug, Dr. DeLuca concluded that Mr. Murray's gynecomastia was caused by Risperdal.

[Janssen's] expert[,] Alan Rogol, M.D., an academic pediatric endocrinologist, concluded otherwise. He asserted that any relationship between Risperdal and gynecomastia is rare. He pointed out that [Mr. Murray's] medical records showed that his pediatricians never diagnosed gynecomastia, nor marked any abnormality of the chest. The jury, however, accepted the assertions of [Mr. Murray]. It came to the reasonable conclusion that Mr. Murray suffered from gynecomastia which was caused by Risperdal, and awarded him the sum of $1,750,000 for the permanent deformity and embarrassment and humiliation arising from this condition.

TCO at 2-6.

Following the jury trial, Janssen moved for judgment notwithstanding the verdict (JNOV) or, alternatively, modification of the verdict and remittitur of the damages award under Maryland law. Mr. Murray petitioned for delay damages. In response, the trial court denied Janssen's motion for JNOV, as well as Mr. Murray's petition for delay damages. It granted Janssen's request to mold and reduce the damages award pursuant to Md. Code Ann., Cts. & Jud. Proc. § 11-108, which places a cap on noneconomic damages. As a result, the trial court reduced the jury's verdict from $1,750,000 to $680,000.

Both parties filed timely notices of appeal. Janssen and Mr. Murray

respectively present the following issues for our review:

> 1. Was the evidence insufficient to support the conclusion that Risperdal® caused [Mr. Murray's] gynecomastia, where: (a) no treating physician ever diagnosed [Mr. Murray] with gynecomastia; (b) no reliable contemporaneous evidence supported the expert's speculative conclusion that [Mr. Murray] developed gynecomastia while taking Risperdal®; and (c) the expert failed to exclude another likely cause of [Mr. Murray's] condition?

Janssen's Brief at 4.

> 1. Did the trial court improperly grant a global motion summary judgment [*sic*] on the claims for punitive damages of all Risperdal plaintiffs, including [Mr.] Murray, especially where ample evidence in this case supported a claim of punitive damages against Janssen?
>
> 2. Did the trial court improperly apply a Maryland cap on non-economic damages to mold and reduce [Mr. Murray's] award?

Mr. Murray's Brief at 4.

We address Janssen's issue first. In reviewing its sufficiency claim, we

apply the following standard of review:

> When examining the propriety of a trial court's decision to deny [JNOV], we must determine whether there is sufficient competent evidence to sustain the verdict. We will review all of the evidence in the light most favorable to the verdict-winner and will give that party the benefit of every reasonable inference arising from that evidence while rejecting all unfavorable testimony and inferences. [JNOV] may be entered where: (1) the moving party is entitled to judgment as a matter of law and/or (2) the evidence is such that no two reasonable minds could disagree that the verdict should have been rendered for the moving party. Our scope of review is plenary concerning any questions of law. Regarding questions of credibility and the weight accorded the evidence at trial, however, we will not substitute our judgment for that of the fact-finder.

[JNOV] should be entered only in a clear case, and "any doubts must be resolved in favor of the verdict winner."

*Carrozza v. Greenbaum*, 866 A.2d 369, 379 (Pa. Super. 2004) (internal citations omitted).

According to Janssen, the trial court abused its discretion by refusing to grant judgment in its favor because Mr. Murray did not meet his burden of proving that Risperdal caused his gynecomastia. *See* Janssen's Brief at 15. Janssen points out that Dr. DeLuca — Mr. Murray's hired expert and the only medical doctor to conclude that Mr. Murray has gynecomastia — physically examined Mr. Murray for the first time in October 2015. Nevertheless, Dr. DeLuca testified that Risperdal — which, again, Mr. Murray used from April 2003 through approximately February 2008 — was a "major cause" of Mr. Murray's gynecomastia, and explained that "he believed that [Mr. Murray] has had gynecomastia since 2006, 2008[,] based on a historic photograph of [Mr. Murray] and the present-day testimony of his mother." *Id.* at 19 (citation, internal quotations, and original brackets omitted); *see also* TCO at 2. Consequently, Janssen claims that the evidence was insufficient to support that Risperdal caused Mr. Murray's gynecomastia where "(a) no treating physician ever diagnosed [Mr. Murray] with gynecomastia; (b) no reliable contemporaneous evidence supported the expert's speculative conclusion that [Mr. Murray] developed gynecomastia while taking Risperdal®; and (c) the expert failed to exclude another likely cause of [Mr. Murray's] condition[.]" *Id.* at 4. We address these arguments in turn.

Initially, Janssen asserts that Dr. DeLuca could not have determined that Mr. Murray developed gynecomastia while taking Risperdal "based on a single 2007 photograph of [Mr. Murray] shown seated and fully-clothed." *Id.* at 20 (footnote omitted).[3] It urges that "a physical examination is essential to distinguish between true gynecomastia — enlarged breasts due to the presence of breast tissue, and pseudogynecomastia — enlarged breasts due to the accumulation of fat tissue[.]" *Id.* Janssen argues that "even if the photograph was suggestive of an enlarged chest, there was no testimony indicating that Dr. DeLuca or anyone else could rely on it to determine the cause of enlargement." *Id.* at 16.

However, our review of the record indicates that Dr. DeLuca did not merely rely on a photograph to conclude that Mr. Murray developed gynecomastia while using Risperdal. He also examined Mr. Murray's school, medical, and pharmacy records, as well as a mammogram performed on Mr. Murray in November 2014. *See* TCO at 6; N.T. Trial, 10/29/2015, at 19, 23, 34. With respect to the mammogram, Dr. DeLuca testified to the following:

> [Mr. Murray's attorney:] Now, going to the comment section, it looks like they're describing what the x-ray, the mammogram shows a little bit more, right?
>
> [Dr. DeLuca:] Yes.

_____

[3] Janssen notes that "this photograph … depicts [Mr. Murray] overweight, fully-clothed and sitting in a bumper car." Janssen's Brief at 20 n.15. According to Janssen, "[t]his is the only photograph shown at trial that was taken during the time [Mr. Murray] was taking Risperdal®." *Id.* (citations to record omitted).

[Mr. Murray's attorney:] It talks about how the bilateral breast demonstrates ill-defined somewhat flame-shaped retroareolar densities bilaterally. First of all, bilaterally, what do they mean?

[Dr. DeLuca:] Both breasts.

[Mr. Murray's attorney:] Not just the left, but both?

[Dr. DeLuca:] Correct.

[Mr. Murray's attorney:] When they're talking about flame-shaped retroareolar densities, what is the significance to you, if any, of that?

[Dr. DeLuca:] ***In the medical literature it is flame-shaped densities, also called in other terms dendritic densities, are described typically in a boy in this case, or an individual who have breasts for long time*** [*sic*]***. Longstanding gynecomastia***.

[Mr. Murray's attorney:] It's not something that showed up; longstanding.

[Dr. DeLuca:] That's what it typically means.

[Mr. Murray's attorney:] Mammograms show longstanding gynecomastia; is that fair?

[Dr. DeLuca:] It is fair. ***It describes findings consistent with longstanding gynecomastia.***

N.T. Trial, 10/29/2015, at 24-25 (emphasis added).

In addition to his testimony regarding the mammogram, Dr. DeLuca stated:

[Mr. Murray's attorney:] And you've reviewed photographs of [Mr. Murray] going back to, what, 2007?

[Dr. DeLuca:] Correct.

[Mr. Murray's attorney:] And in all those photographs from 2007 – and you actually examined him two, three weeks ago?

[Dr. DeLuca:] October 13th.

[Mr. Murray's attorney:] All right. In all that time, what have you – just kind of doing the eye test, what do you think the difference is in the way his breasts have progressed?

[Dr. DeLuca:] Reviewing all those photos, to me it looks – he has had breasts of similar size for all those years.

[Mr. Murray's attorney:] So when we are kind of putting together the pieces of this puzzle, he took Risperdal, had – from 2003 to 2008. That's one piece, right?

[Dr. DeLuca:] Correct.

[Mr. Murray's attorney:] That dosage increased. That's another piece, right?

[Dr. DeLuca:] Yes.

[Mr. Murray's attorney:] Likely to have elevated prolactin. That's another piece?

[Dr. DeLuca:] Yes.

[Mr. Murray's attorney:] We have photographs showing what – showing breasts?

[Dr. DeLuca:] Yes.

[Mr. Murray's attorney:] Mammogram?

[Dr. DeLuca:] Correct.

[Mr. Murray's attorney:] Physical exam?

[Dr. DeLuca:] Yes.

…

[Mr. Murray's attorney:] Did [Mr. Murray's] mother talk about when she first started to notice breasts?

[Dr. DeLuca:] I believe she stated that she noticed around 2008 [or] 2007….

[Mr. Murray's attorney:] Okay. And -

[Dr. DeLuca:] Although, if I may add, at another point in the deposition she said that she was told by [Mr. Murray] he had been teased because of his breasts when – in 2006, 2007. So essentially during those two-year period [*sic*].

[Mr. Murray's attorney:] Is one of the things you also reviewed his school records?

[Dr. DeLuca:] Yes.

[Mr. Murray's attorney:] Was there anything in his school records about him being teased?

[Dr. DeLuca:] If I remember correctly, in 2008, there was again a school record in which it was stated that [Mr. Murray's] mother essentially reported that [Mr. Murray] had been teased -

[Mr. Murray's attorney:] And -

[Dr. DeLuca:] – by schoolmates.

[Mr. Murray's attorney:] So when you're putting all these pieces of the puzzle together, when is it that you believe, approximately, he developed gynecomastia?

[Dr. DeLuca:] Again, I cannot be specific on the date, but based on all those elements, I believe he has had gynecomastia since 2006, 2008.

[Mr. Murray's attorney:] Okay. Do you have an opinion as to whether Risperdal is the cause or one of the major causes of that?

…

[Dr. DeLuca:] I'm convinced that Risperdal was a major cause of his gynecomastia.

N.T. Trial, 10/29/2015, at 32-33, 34-35.

In light of the foregoing, we do not agree that Dr. DeLuca based his diagnosis on a single photograph of Mr. Murray from 2007. The testimony makes clear that Dr. DeLuca did not simply rely on this single photograph, but instead considered other factors — such as Mr. Murray's mammogram, his pharmacy and school records, and the results of his physical examination — to conclude that Mr. Murray developed gynecomastia while using Risperdal.

Janssen next contests Dr. DeLuca's reliance on Mrs. Murray's testimony "to back-date the onset of [Mr. Murray's] gynecomastia[.]" Janssen's Brief at 21. Janssen explained:

> While Mrs. Murray initially testified that she observed breast growth after [Mr. Murray] discontinued Risperdal® and lost weight in 2008, upon further questioning she agreed with [Mr. Murray's] counsel's suggestion that she noticed breasts in "2007-ish, 2006-ish, early part of 2008." She did not express concern to any of [Mr. Murray's] doctors until, according to her testimony, she raised the issue of [Mr. Murray's] **weight gain** with Dr. Langfitt. Tellingly, she did not claim to raise the specific issue of breast growth with Dr. Langfitt or [Mr. Murray's] other doctors. Nor did she seek treatment for his condition. Indeed, there is no mention of breast growth in any of Dr. Langfitt's records, and he otherwise has no recollection of a discussion taking place at or near the time [Mr. Murray] was taking Risperdal®.
>
> Rather, according to his records and testimony, Mrs. Murray never mentioned breast growth until November 2014 — more than six years after [Mr. Murray] discontinued Risperdal® — when she requested a mammogram only **after** consulting with an attorney in connection with this lawsuit. She did not request the mammogram for the purpose of seeking treatment on his behalf. To the contrary, she "wanted to have some evidence that he had gynecomastia" for purposes of filing the lawsuit. Therefore, Mrs. Murray's self-serving testimony that she observed breast growth before 2008 is uncorroborated by the medical evidence and cannot support Dr. DeLuca's opinion — which he must hold to a reasonable degree of medical certainty — that [Mr. Murray] developed gynecomastia at or near the time he took Risperdal®.

*Id.* at 21-23 (internal citations and footnote omitted; emphasis in original).

To begin, we disagree with Janssen's assertion that Mrs. Murray initially testified that she observed Mr. Murray's breast growth after Mr. Murray stopped using Risperdal and lost weight in 2008. Our review of the record reveals that she was aware of Mr. Murray's breast growth prior to 2008:

[Mr. Murray's attorney:] [D]id [Mr. Murray] also have any problems with his peers at the school?

[Mrs. Murray:] Yes. Sometimes they teased him about the way he looked and, you know, I'd have to call the school and talk to the teacher about it and -

[Mr. Murray's attorney:] Can you recall any specific instances?

[Mrs. Murray:] One time in gym class when he was in middle school when they were changing clothes, he had a couple of guys teasing him about his chest or his breasts and it upset him very much. And I had to call the school the next day to talk to the teacher and see what we could do about getting him moved or something, which they did eventually move him to a different place to change his clothes, but you shouldn't have to go through that.

[Mr. Murray's attorney:] And do you remember how old or what grade he was in then?

[Mrs. Murray:] He was in the 7th or 8th grade.

[Mr. Murray's attorney:] 7th or 8th grade?

[Mrs. Murray:] Uh-huh.

[Mr. Murray's attorney:] So that's – is that 12 or 13?

[Mrs. Murray:] Yeah.

[Mr. Murray's attorney:] Okay. And he was born in what year?

[Mrs. Murray:] 1993.

[Mr. Murray's attorney:] All right. ***So we're talking 2006-ish?***

[Mrs. Murray:] ***Yeah, probably.***

N.T. Trial, 10/30/2015, at 20-21 (emphasis added).

Further, Janssen claims that Mrs. Murray's testimony is "self-serving and uncorroborated by the medical record" because she did not raise the specific issue of breast growth to Mr. Murray's doctors at an earlier time. Janssen's

Brief at 16.[4]  We view this argument as an attack on Mrs. Murray's credibility, and we decline to substitute our judgment for that of the jury.  ***See Carrozza***, 866 A.2d at 379 ("Regarding questions of credibility and the weight accorded the evidence at trial, however, we will not substitute our judgment for that of the fact-finder.") (citation omitted).  Thus, we do not consider Mrs. Murray's testimony as being insufficient evidence for Dr. DeLuca to rely on in establishing causation.

Last, Janssen challenges the sufficiency of the evidence on the basis that "Dr. DeLuca failed to provide evidence to support his conclusory dismissal of persistent pubertal gynecomastia as a potential alternate explanation for [Mr. Murray's] condition."  Janssen's Brief at 23.  Janssen claims that, though Dr. DeLuca testified that "***most*** of the times [pubertal gynecomastia] goes away…[,]" he did not offer "any explanation as to why, in his opinion, persistent pubertal gynecomastia did not explain [Mr. Murray's] condition…."  ***Id.*** at 23-24 (quoting, in part, N.T. Trial, 10/29/2015, at 39; emphasis in original; some brackets added).

Dr. DeLuca provided the following testimony at trial regarding pubertal gynecomastia:

_____

[4] Mrs. Murray testified that she originally thought Mr. Murray's breasts were related to his weight gain.  N.T. Trial, 10/30/2015, at 30.  But, when Mr. Murray subsequently began losing weight, his breasts remained.  ***Id.***  At that point, Mrs. Murray believed Mr. Murray's breasts were just a part of his "bad luck[,]" and did not learn that Risperdal was linked to breast growth until years later.  ***Id.*** at 30-31.

[Mr. Murray's attorney:] And what about – kind of talking about some other causes of gynecomastia, can puberty cause gynecomastia?

[Dr. DeLuca:] During puberty some boys do develop some breast tissue.

[Mr. Murray's attorney:] And during opening statements, [Janssen's counsel] said that you think that 65 percent of boys['] going through puberty have gynecomastia; is that correct? Is that really your opinion?

[Dr. DeLuca:] That is not my opinion. I was referring to a specific one single paper that now dates back 40 years or so.

[Mr. Murray's attorney:] What does the most recent data show about how often kids, boys going through puberty have gynecomastia?

[Dr. DeLuca:] I can think of at least about two recent papers which essentially describe research in several … thousands of children, of adolescents, and they report the percentage in the order of three percent, four percent in the whole adolescent population of boys.

[Mr. Murray's attorney:] Of those percentage of boys that have gynecomastia when they're going through puberty, is it long lasting?

[Dr. DeLuca:] Again, also, there is medical literature about the duration of – the typical duration [of] gynecomastia seen in puberty. ***It is transient data show[ing] that most of the time[] [it] goes away, sometimes within six months, [it] doesn't last more than two or three years***.

[Mr. Murray's attorney:] Common sense, putting aside the medical studies, we all kind of remember being adolescents. Sixty-five percent of 15-year-olds, or boys going through puberty, have gynecomastia. People would know about that, obviously, right?

[Dr. DeLuca:] I can say that in general practice, even pediatrics, I'm sure they would tell you that they can safely say that it's not true that two-thirds of the boys they examine have breasts.

[Mr. Murray's attorney:] And before I got off on that tangent about pubertal gynecomastia – that's what it's called when you're going through puberty, right?

[Dr. DeLuca:] Right.

[Mr. Murray's attorney:] Pubertal gynecomastia usually goes away by when? How long?

[Dr. DeLuca:] Again, the study I'm talking about, examine[d] boys up to 17 years of age, at least one particular study. In that study I think 1.7 percent of the 17 year olds had breast tissue.

[Mr. Murray's attorney:] When you examined [Mr. Murray] a couple weeks ago, did you specifically try to determine whether he is finished going through puberty?

[Dr. DeLuca:] I examined his genitals, and based on my examination, based on the size of his testicles, based on the distribution of the pubic hair, even based on the size of his penis, I know that he has completed his puberty as an adult young man.

[Mr. Murray's attorney:] What does that tell you – by the way, that's standard stuff to do -

[Dr. DeLuca:] Absolutely.

[Mr. Murray's attorney:] – to look at for kids, whether they have gynecomastia?

[Dr. DeLuca:] Yes.

[Mr. Murray's attorney:] What does that tell you about whether puberty is the reason that [Mr. Murray] has gynecomastia?

[Dr. DeLuca:] That tells me that he has completed puberty for quite some time, and, therefore, again, being pubertal gynecomastia, transient, what I see now at age almost 22, I believe is not due – is not related to puberty, because, again, being transient and occurring in certain phases of puberty and not typically at the end of puberty.

N.T. Trial, 10/29/2015, at 38-41 (emphasis added).

We do not agree that Dr. DeLuca failed to provide evidence to support excluding persistent pubertal gynecomastia as an alternate explanation for

- 17 -

Mr. Murray's condition. *See* Janssen's Brief at 23-24 (citing Pa.R.E. 705).[5] At the outset, to the extent Janssen challenges Dr. DeLuca's testimony under Pa.R.E. 705, its claim is waived for failing to make a contemporaneous objection on the record. *See State Farm Mutual Auto Insurance*, 108 A.3d 882, 885 (Pa. Super. 2015) ("It is axiomatic that in order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue.") (citations, quotation marks, and brackets omitted). In any event, however, the above testimony demonstrates that Dr. DeLuca excluded puberty as a potential cause after evaluating Mr. Murray's age and medical history, conducting a physical examination of Mr. Murray, and reviewing relevant studies and medical literature, among other things. *See also* Mr. Murray's Brief at 30 ("Dr. DeLuca described that he relied upon [Mr.] Murray's medical records, depositions, the Risperdal label and relevant medical literature, in addition to his extensive training and experience to offer a differential diagnosis for [Mr. Murray's] condition and the cause of his condition.") (citation omitted). Accordingly, we determine that Dr. DeLuca sufficiently explained why pubertal gynecomastia did not account for Mr. Murray's breast

---

[5] Pennsylvania Rule of Evidence 705 sets forth: "If an expert states an opinion the expert must state the facts or data on which the opinion is based." Pa.R.E. 705.

growth, and we therefore conclude that Janssen's sufficiency challenge fails on this basis as well.

We next consider the issues raised by Mr. Murray in his cross-appeal. First, he claims that the trial court erred by granting Janssen's global motion for partial summary judgment on the issue of punitive damages. *See* Mr. Murray's Brief at 31. He states that the trial court dismissed the punitive damages claims of thousands of plaintiffs — including his own claim — because it determined that New Jersey law applied, and that the New Jersey Products Liability Act (NJPLA), N.J.S. § 2A:58C–1 to –11,[6] barred all of the plaintiffs from receiving punitive damages. *Id.* Mr. Murray insists that the trial court should not have dismissed these claims without considering each plaintiff's unique case circumstances, such as place of injury and domicile, along with

---

[6] The NJPLA states, in relevant part:

> Punitive damages shall not be awarded if a drug or device or food or food additive which caused the claimant's harm was subject to premarket approval or licensure by the federal Food and Drug Administration under the "Federal Food, Drug, and Cosmetic Act," 52 Stat. 1040, 21 U.S.C. § 301 *et seq.* or the "Public Health Service Act," 58 Stat. 682, 42 U.S.C. § 201 *et seq.* and was approved or licensed; or is generally recognized as safe and effective pursuant to conditions established by the federal Food and Drug Administration and applicable regulations, including packaging and labeling regulations. However, where the product manufacturer knowingly withheld or misrepresented information required to be submitted under the agency's regulations, which information was material and relevant to the harm in question, punitive damages may be awarded. []

N.J.S. § 2A:58C–5(c).

the governmental interests of those locations. ***See id.*** at 31-32. In particular, with respect to his specific case, Mr. Murray argues that "Pennsylvania choice-of-laws analysis strongly supports application of Maryland law[,]" and that "[t]his analysis underscores that, rather than enter a global [order], the trial court should have permitted [Mr. Murray] to develop facts and state interests important to his particular circumstances." ***Id.*** at 38. Mr. Murray further maintains that, under either New Jersey or Maryland law, "there was ample evidence to justify a trial on punitive damages[,]" and — even if New Jersey law were to apply — he challenges Janssen's NJPLA defense given that "Risperdal … was not an approved drug with respect to [his] conditions." ***Id.*** at 38, 47.

Janssen, on the other hand, avers that the Risperdal plaintiffs, including Mr. Murray, did not raise issues before the trial court concerning "whether a global ruling was premature, or whether fact issues precluded a global ruling that would apply in every case." Janssen's Brief at 18-19. Similarly, Janssen contends that the Risperdal plaintiffs also waived their arguments that "Pennsylvania's choice-of-law rules require application of a [p]laintiff's home-state punitive[]damage[s] law in every case[,]" and that the NJPLA "permits the imposition of punitive damages when a drug such as Risperdal® is used for an unapproved ('off-label') use." ***Id.*** at 19. Nonetheless, even if these issues were properly preserved below, Janssen states that "the coordinating judge properly found that New Jersey has the most significant interest in having its punitive[]damage[s] law applied in all Philadelphia Risperdal®

cases[,]" and — with respect to Mr. Murray's specific case — New Jersey's interest in applying its punitive damages law is greater than Maryland's interest. *Id.* at 40, 51 (unnecessary emphasis and capitalization omitted). Finally, Janssen counters that the NJPLA precludes punitive damages in this case because "the NJPLA's punitive[]damage[s] bar applies when the *drug* has been approved by the FDA, regardless of whether [Mr. Murray] has used the drug for an approved or unapproved indication." *Id.* at 58 (emphasis in original).

In reviewing the trial court's grant of the global motion for partial summary judgment, we abide by the following standard of review:

> [I]n reviewing the grant of summary judgment, the following principles apply. Summary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party. In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party, and, thus, may only grant summary judgment where the right to such judgment is clear and free from all doubt. On appellate review, then, an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion. But the issue as to whether there are no genuine issues as to any material fact presents a question of law, and therefore, on that question our standard of review is *de novo*. This means we need not defer to the determinations made by the lower tribunals. To the extent that this Court must resolve a question of law, we shall review the grant of summary judgment in the context of the entire record.

*Feleccia v. Lackawanna College*, 156 A.3d 1200, 1209 (Pa. Super. 2017) (citations and original brackets omitted).

To begin, we address whether waiver precludes our review of Mr. Murray's claim that the trial court improperly applied New Jersey law to the punitive damages claims of all Risperdal plaintiffs. Our Court has recently confronted this exact question of waiver in another Risperdal case, ***Stange v. Janssen Pharmaceuticals, Inc.***, -- A.3d --, 2018 WL 316526, at *11-*14 (Pa. Super. filed Jan. 8, 2018).[7] In ***Stange***, this Court determined that the Risperdal plaintiffs adequately preserved this issue, and addressed whether the law of Wisconsin — the plaintiff's home state in that case — should govern his punitive damages claim. ***Id.*** at *14-*15.[8] Thus, we likewise decline to find waiver on this question, and will consider Mr. Murray's argument that Maryland law should apply to his punitive damages claim.

This Court has explained:

In addressing which substantive law to apply, we employ the conflict-of-law principles that our High Court framed in ***Griffith v. United Air Lines, Inc.***,…203 A.2d 796 ([Pa.] 1964). In ***Griffith***, our Supreme Court altered its approach in determining which substantive law to apply in tort cases. Prior to that decision, Pennsylvania followed the ***lex loci delicti*** rule, which applied the substantive law of the place where the tort was committed. ***Id.*** at 801. However, the High Court abandoned that mechanical

---

[7] Mr. Murray filed an application for post-submission communication, in which he asks us to take notice of this recently published precedential opinion. We hereby grant his application and consider ***Stange***, ***infra***.

[8] In ***Stange***, however, we agreed with Janssen that the Risperdal plaintiffs waived "the issue regarding whether Risperdal had been 'approved' within the meaning of the NJPLA[,]" as they did not properly preserve their argument "that the NJPLA did not preclude punitive damages because Risperdal did not achieve FDA approval for any pediatric use until October 2006." ***Id.*** at *14 n.7. Consequently, we also find the identical argument raised by Mr. Murray waived.

- 22 -

approach in favor of a methodology that combined the "government interest" analysis and the "significant relationship" approach of sections 145 and 146 of the Restatement (Second) of Conflicts…. *Id.* at 801-06.

*Griffith, supra*, addressed the choice of law question in an action brought by the executor of a Pennsylvania resident killed in a plane crash during a landing in Denver on a flight from Philadelphia, Pennsylvania to Phoenix, Arizona. *Id.* at 797. Concluding that the plane crash in Colorado was "purely fortuitous" and that Pennsylvania had a greater interest in the executor's recovery, our Supreme Court discarded the *lex loci delicti* rule for a flexible methodology that permitted courts to conduct an "analysis of the policies and interests underlying the particular issue before the court." *Griffith, supra* at 805[].

Section 145(2) of the Restatement (Second) of Conflicts sets forth the contacts to be considered in applying the analysis required under *Griffith*. They include:

(a) the place where the injury occurred;

(b) the place where the conduct causing the injury occurred;

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and

(d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) of Conflict of Laws § 145 ([1971]).

We evaluate these four factors mindful of the overarching choice-of-law principles enumerated in § 6 of the Restatement (Second). Those considerations include the following:

(a) the needs of the interstate and international systems;

(b) the relevant policies of the forum;

(c) the relevant policies of the other interested states and the relevant interests of those states in determination of a particular issue;

(d) the protection of justified expectations;

(e) the basic policies underlying the particular field of law;

(f) certainty, predictability and uniformity of result; and

(g) ease in the determination and application of the law to be applied.

*Id.* § 6.

***Stange***, 2018 WL 316526, at *15 (some citations omitted).

Moreover,

[a] true conflict occurs where an analysis of the policies underlying each of the conflicting laws reveals that, in each case, application of the respective state's law would further its corresponding policy. If a true conflict exists, we then proceed to determine which jurisdiction has the greater interests, considering the qualitative contacts of the states, the parties and the controversy.

*Id.* (citations omitted).

In ***Stange***, we determined that a true conflict existed between the laws of New Jersey, Janssen's principal place of business, and Wisconsin, the plaintiff's home state. *Id.* at *16.[9] We observed that "the NJPLA does not permit the imposition of punitive damages in pharmaceutical products liability cases where the drug was approved by the FDA[,]" while "Wisconsin caps punitive damages at twice the amount of any compensatory damages or $200,000, whichever is greater, but does not otherwise limit punitive damages in pharmaceutical cases." *Id.* (citation omitted). Given this true conflict of law, we explained that "the trial court must determine which state, New Jersey

_____

[9] In granting Janssen's global motion for partial summary judgment, the trial court observed that Appellant/Cross-Appellee Johnson & Johnson is incorporated and has a principal place of business in New Jersey. Trial Court Opinion, 10/22/2015, at 8. Appellant/Cross-Appellee Janssen Research & Development, LLC is also incorporated in New Jersey. *Id.* Appellant/Cross-Appellee Janssen Pharmaceuticals, Inc. is incorporated in Pennsylvania, but has a principal place of business in New Jersey. *Id.*

or Wisconsin, has the most significant relationship to the parties and the occurrence to determine which jurisdiction's substantive law applies." *Id.* (footnote omitted). Because the trial court had not evaluated whether Wisconsin law should apply, we reversed the order granting partial summary judgment to Janssen on the punitive damages issue and "remand[ed] for the trial court to allow [the plaintiff] to develop an individual record on choice-of-law as it relates to his unique circumstances and to set out the facts and state interests important to his particular case." *Id.*

In the case *sub judice*, neither party disputes that a true conflict exists between the laws of New Jersey, the principal place of business of Janssen, and Maryland, Mr. Murray's home state. *See* Mr. Murray's Brief at 35; Janssen's Brief at 37. New Jersey allows punitive damages to be awarded to the plaintiff "only if the plaintiff proves, by clear and convincing evidence, that the harm suffered was the result of the defendant's acts or omissions, and such acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions." N.J.S. § 2A:15-5.12(a). Significantly, however, New Jersey does not permit the imposition of punitive damages in pharmaceutical products liability cases where the FDA has approved the drug, as mentioned above in our discussion of *Stange*. *See* N.J.S. § 2A:58C-5(c). By enacting the NJPLA, New Jersey's legislature "intended to reduce the burden on manufacturers of FDA-approved products resulting from products

liability litigation." *Kendall v. Hoffman-La Roche, Inc.*, 36 A.3d 542, 554 (N.J. 2012) (citation omitted).

In contrast, Maryland permits punitive damages "in an attempt to punish a defendant whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability." *Beall v. Holloway-Johnson*, 130 A.3d 406, 419-20 (Md. 2016) (citation omitted). "The evidence must show malicious conduct and not simply … negligence in order to justify an award of punitive damages." *Id.* at 420 (citation and internal quotation marks omitted). Neither party asserts that Maryland law limits punitive damages awards in pharmaceutical products liability cases. Thus, we agree that a true conflict exists between the laws of New Jersey and Maryland.

Because a true conflict exists, the trial court must determine whether the substantive law of New Jersey or Maryland applies, using the analysis outlined, *supra.* Mr. Murray claims that Maryland law should apply because Janssen's communications with Dr. Pinit, Dr. Langfitt, and Dr. Greenbaum occurred in Maryland. Mr. Murray's Brief at 36. He argues that Janssen directed its inadequate warnings to Mr. Murray's doctors in Maryland, had its salespersons visit Dr. Pinit fourteen times over many years in Maryland, and failed to disclose Risperdal's actual risks in Maryland. *Id.* Further, Mr. Murray advances that he was prescribed Risperdal and developed gynecomastia in Maryland. *Id.* Finally, Mr. Murray states that Maryland "has overriding interests in regulating corporate entities conducting business there, and in

penalizing the type of outrageous conduct that caused [Mr. Murray's] injuries and deterring Janssen from engaging in similar conduct against its citizens in the future." *Id.* at 38.

Janssen, in contrast, contends that Mr. Murray's "punitive[ ]damage[s] case involves claims that Janssen misled federal regulators, outside consultants, physicians, and the public. The locus of this alleged conduct was [Janssen's] principal place of business in New Jersey, where Janssen developed the strategies and communications that [Mr. Murray] criticizes." Janssen's Brief at 43-44 (citation omitted). In addition, it submits that "New Jersey has an interest in balancing the preservation of its economy and the policing of its own corporate citizens." *Id.* at 48. According to Janssen, "this interest would be upset if another state's law is applied to punish New Jersey companies for alleged conduct in New Jersey." *Id.*

Because the trial court previously concluded that New Jersey law should apply to the punitive damages issue for all Risperdal plaintiffs regardless of case-specific facts, we remand this matter so that Mr. Murray may create an individual record pertaining to the distinct conflict-of-law principles at play in his particular case. *See Stange*, 2018 WL 316526, at *16 ("[I]t is necessary to reverse the order granting partial summary judgment for the defendants on the punitive damages issue and remand for the trial court to consider the conflict-of-law principles developed in *Griffith, supra*.") (footnote omitted).

Finally, Mr. Murray challenges whether the trial court improperly applied a Maryland cap on noneconomic damages to mold and reduce his award. *See*

Mr. Murray's Brief at 4. His argument on this issue is two-fold: First, he claims that remitting the verdict is a procedural mechanism, and the law of the forum, *i.e.,* Pennsylvania, should apply. *Id.* at 49, 50. Second, Mr. Murray insists that, even if not a procedural matter, Pennsylvania law should nevertheless apply because the substantive policy underlying Maryland's damages cap — namely to address an insurance crisis in Maryland — would not be served in this case, as Janssen does not purchase insurance on the Maryland market. *Id.* at 51.

We start with Mr. Murray's argument that remittitur is a procedural mechanism. Initially, we note that "procedural law is the set of rules which prescribe the steps by which the parties may have their respective rights and duties judicially enforced[,]" whereas "[s]ubstantive law is the portion of the law which creates the rights and duties of the parties to a judicial proceeding." *See Sheard v. J.J. DeLuca Co., Inc.*, 92 A.3d 68, 76 (Pa. Super. 2014) (citation omitted). "In conflicts cases involving procedural matters, Pennsylvania will apply its own procedural laws when it is serving as the forum state." *Commonwealth v. Sanchez*, 716 A.2d 1221, 1223 (Pa. 1998). In comparison, as we discussed above when addressing the punitive damages issue, "[i]n cases where the substantive laws of Pennsylvania conflict with those of a sister state in the civil context, Pennsylvania courts take a flexible approach which permits analysis of the policies and interests underlying the particular issue before the court." *Id.* (citation omitted).

We do not agree with Mr. Murray that this issue involves a question of procedure. Mr. Murray bases his procedure argument on the premise that the trial court granted remittitur, which has been defined as the "procedural [process] by which an excessive verdict of the jury is reduced." Mr. Murray's Brief at 50 (quoting *Refuse Management Systems, Inc. v. Consolidated Recycling and Transfer Systems, Inc.*, 671 A.2d 1140, 1149 (Pa. Super. 1996)). In Pennsylvania, "the decision on a requested remittitur is addressed to the discretion of the trial court. A remittitur or judicial reduction of a jury award is appropriate only when the award is plainly excessive and exorbitant." *See Zauflik v. Pennsbury School District*, 104 A.3d 1096, 1129 (Pa. 2014) (citations, quotation marks, and original brackets omitted). While we acknowledge that the trial court and the parties used the term 'remittitur' below, we concur with Janssen that the trial court actually reduced the verdict by applying the Maryland damages cap, a substantive limitation. *See* Janssen's 3rd-Step Reply Brief at 67.[10]

Here, the Maryland statutory cap at issue sets forth that an award for noneconomic damages in a personal injury action may not exceed $500,000, with an additional $15,000 to be added each year beginning on October 1, 1995. Md. Code Ann., Cts & Jud. Proc. § 11-108(b)(2). If the jury awards an amount for noneconomic damages that exceeds this limit, "the court **shall**

---

[10] Indeed, the trial court even noted that "[t]he term remittitur used in the decision means molding by reducing the verdict in accordance with the Maryland cap on non-economic damages pursuant to Md. Code Ann., Cts & Jud. Proc. § 11-108(b)." TCO at 1 n.1.

- 29 -

reduce the amount to conform to the limitation." Md. Code Ann., Cts & Jud. Proc. § 11-108(d)(2)(i) (emphasis added). Thus, using the above-stated statutory formula, the trial court concluded that Mr. Murray could not receive more than $680,000 in damages, and reduced the jury's award of $1,750,000 accordingly. TCO at 13.[11] Consequently, the trial court did not use remittitur, at its discretion and as a mere procedural mechanism, to reduce a 'plainly excessive and exorbitant' verdict. Instead, it reduced the jury's award in response to Maryland's statutory limitation on noneconomic damages, which Maryland's high court has classified as part of its substantive law, not procedural law. *Erie Insurance Exchange v. Heffernan*, 925 A.2d 636, 653 (Md. 2007) (stating that Maryland's cap on noneconomic damages is "part of the substantive law of Maryland, not our procedural law"). Thus, we reject Mr. Murray's argument that the trial court's reducing the verdict sounds in procedure and requires application of forum law.

In the second prong of his argument, Mr. Murray asserts that Maryland instituted the cap on noneconomic damages to address "the legislatively-perceived insurance crisis in Maryland at the time of enactment." Mr. Murray's Brief at 51 (citing *DRD Pool Service, Inc. v. Freed*, 5 A.3d 45, 56 (Md. 2010); emphasis in brief). However, because Janssen does not purchase insurance in the Maryland market, Mr. Murray argues that "applying the

---

[11] The trial court explained that, because Mr. Murray began taking Risperdal in 2003, and the jury rendered its verdict in November 2015, "the sum of $180,000 ([$]15,000 times twelve years) is added to the $500,000 base amount, totaling $680,000." TCO at 13 n.3.

statute here fails to serve the substantive policy of Maryland." *Id.* Thus, he says Pennsylvania law should apply, and notes that Pennsylvania law does not "require remittitur of compensatory damages[,]" and in fact "recognizes that there is no certain formula by which noneconomic damages are capable of measurement." *Id.* at 50 (citing, in part, ***Nelson v. Airco Welders Supply***, 107 A.3d 146, 161 (Pa. Super. 2014)).[12] Mr. Murray suggests that, if Pennsylvania law were to apply, the Pennsylvania jury could retain its "authority to award certain amounts of damages[,]" and the Pennsylvania trial court could exercise its "authority to decide whether remittitur is warranted." *Id.* at 51.

> As discussed above, in ascertaining which substantive law to apply,
>
> the first step in a choice of law analysis under Pennsylvania law is to determine whether an actual conflict exists between the laws of the competing states. If no actual conflict exists, further analysis is unnecessary. An actual conflict exists if there are relevant differences between the laws.
>
> If an actual conflict exists, then we classify it as "true," "false," or "unprovided-for." A "true conflict" occurs when the governmental interests of both jurisdictions would be impaired if their law were not applied. A ["]false conflict["] exists if only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law. In such a situation, the court must apply the law of the state whose interests would be harmed if its law were not applied. In "unprovided-for" cases, "neither jurisdiction's interests would be impaired if its laws are not

---

[12] To be sure, Rule of Civil Procedure 223.3 does not provide a formula or cap for noneconomic damages, but instead sets forth that plaintiffs should be "fairly and adequately compensated" for noneconomic losses. ***See*** Pa.R.C.P. 223.3.

applied."[15]  If a true conflict is found, then we must determine which state has the greater interest in the application of its law.

> [15] [] In tort cases, generally, the law of the state where the injury occurred is applied.  ***See Miller*** [***v. Gay***], … 470 A.2d 1353,] 1355-56 [Pa. Super 1983].

In ***Cipolla v. Shaposka***[, 267 A.2d 854, 855 (Pa. 1970)], our Supreme Court examined whether a true conflict existed between the tort laws of Delaware and Pennsylvania.  ***Id.*** … at 855. The defendant was a Delaware resident and the plaintiff was a Pennsylvania resident.  ***Id.***  The defendant, who was driving a car registered in Delaware, was driving the plaintiff home to Pennsylvania when they collided with another vehicle in Delaware. ***Id.***  The plaintiff sued the defendant for negligence only, and our Supreme Court examined which state's law applied.  ***Id.***  If Delaware law applied, then the plaintiff could not recover under a Delaware statute preventing a guest from recovering for the negligence of the host.  ***Id.***  If Pennsylvania law applied, then the plaintiff could recover if he could establish the defendant's negligence.  ***Id.*** [] The ***Cipolla*** Court reasoned that a true conflict existed because the plaintiff "is a resident of Pennsylvania which has adopted a plaintiff-protecting rule and [the defendant] is a resident of Delaware which has adopted a defendant-protecting rule" and thus a "deeper analysis" was required to determine "which state has the greater interest in the application of its law." ***Id.*** … at 856.

Similarly, in ***Rosen v. Tesoro Petroleum Corp.***, … 582 A.2d 27 ([Pa. Super.] 1990), the Superior Court ascertained whether a true conflict existed between the laws of Pennsylvania and Texas regarding a malicious prosecution claim.  ***Id.*** … at 30. In Pennsylvania, seizure of the plaintiff's person or property is not a necessary element for malicious prosecution.  ***Id.***  Texas, however, requires that a party alleging malicious prosecution suffer physical detention of the claimant's person or property.  ***Id.*** The ***Rosen*** Court held there was a true conflict because Texas wished "to assure every potential litigant free and open access to the judicial system without fear of a countersuit for malicious prosecution." ***Id.***  [] Pennsylvania, in contrast, provided "greater protection to those individuals and entities who may be forced to defend a baseless suit." ***Id.*** … at 31.  Thus, having concluded a true conflict existed, the ***Rosen*** Court then determined which state had "the greater interest in the application of its law on malicious prosecution to the instant matter." ***Id.***

*McDonald v. Whitewater Challengers, Inc.*, 116 A.3d 99, 106-08 (Pa. Super. 2015) (original brackets and some internal citations, quotation marks, and footnotes omitted).

In the case at bar, Maryland statutorily limits noneconomic damages, while Pennsylvania does not. This situation constitutes an actual conflict, and we must identify whether it is a "true conflict," "false conflict," or "unprovided-for conflict." *See id.* at 109.

Maryland's law favors protecting defendants in the interest of limiting their liability and making insurance more available and affordable in the state.[13] Pennsylvania's law appears more plaintiff-friendly, as it sets no cap on noneconomic damages and aims to fairly and adequately compensate plaintiffs, as determined by juries and trial courts.[14] Here, Janssen is not

---

[13] *See Franklin v. Mazda Motor Corp.*, 704 F. Supp. 1325, 1328 (D. Md. 1989) ("The ceiling on noneconomic damages will help contain awards within realistic limits, reduce the exposure of defendants to unlimited damages for pain and suffering, lead to more settlements, and enable insurance carriers to set more accurate rates because of greater predictability of the size of judgments. The limitation is designed to lend greater stability to the insurance market and make it more attractive to underwriters.") (quoting Governor's Task Force to Study Liability Insurance (issued Dec. 20, 1985)).

[14] It does not appear that Mr. Murray argued below that Pennsylvania has an interest in allowing its juries and trial courts to determine noneconomic damages awards, thereby resulting in a false conflict between Maryland and Pennsylvania in determining which state's substantive law applies. Mr. Murray's Response to Janssen's Brief in Support of Motion for Post-Trial Relief, 2/11/2016, at 31-33. Instead, he argued before the trial court that, if the cap were substantive, Pennsylvania law ought to apply simply because Maryland has no interest in applying its statute. *Id.* Therefore, we find any false conflict argument implied by Mr. Murray waived. *Newman Development Group of*

incorporated nor does it have a principal place of business in Maryland, which has a defendant-protecting rule.[15]  In addition, Mr. Murray does not reside in Pennsylvania, which has a plaintiff-friendly rule.  Therefore, this situation constitutes an "unprovided-for" conflict.

In such a scenario, we reiterate that this Court has looked to the Restatement (Second) of Conflict of Laws, which expresses in pertinent part:

> In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied.

[Restatement (Second) of Conflict of Laws § 146 (1971).]

Section 6 states:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
> (2) When there is no such directive, the factors relevant to the choice of the applicable law include.
>
> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue,

---

*Pottstown, LLC v. Genuardi's Family Market, Inc.*, 98 A.3d 645, 658 n.16 (Pa. Super. 2014) ("A new argument cannot be raised in support of an issue on appeal if it was not first presented before the trial court.  Thus, this argument is waived.") (citation omitted).

[15] Again, none of the Janssen Appellants/Cross-Appellees have a principal place of business, nor are incorporated, in Maryland.  *See* footnote 9, *supra.*

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

[*Id.* at § 6.]

*See Miller*, 470 A.2d at 1357-58. Further, in applying the principles of § 6, we take into account the following contacts:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement (Second) of Conflict of Laws § 145 (1971).

In this case, the injury occurred in Maryland. Further, the trial court aptly determined that Maryland has a more significant relationship with the damages issue than Pennsylvania, reasoning:

[I]t is clear in applying Pennsylvania rules as to the choice of law analysis that [Mr. Murray's] argument must fail. Pennsylvania choice of law principles place[] great emphasis on the relationship of the state to the litigation. *See In re Estate of Agostino*, 457 A.2d 861, 871 (Pa. Super. 1983). Applying this principle, Maryland clearly has the most significant contacts to the issues arising from this litigation. [Mr. Murray] was and still is a resident of Maryland. Risperdal was recommended and pr[e]scribed by health care providers located in Maryland. [Mr. Murray] purchased and ingested the drug in Maryland and was injured and treated there as well. Under these circumstances, Maryland has a much greater relationship to this case than Pennsylvania. The

latter is merely the forum state where [Mr. Murray] chose to sue. To hold otherwise would result in a circumvention of Maryland law. [Mr. Murray] whose domiciled state has a restriction on pain and suffering awards could sue [Janssen] here or any other state with no such restrictions. The law of the state with the most significant ties then would be ignored. This is exactly the situation which would occur here if the [c]ourt would apply Pennsylvania damage law to this case.

TCO at 14-15. We concur with the trial court's analysis, and conclude that Maryland has a more significant relationship to the noneconomic damages issue than Pennsylvania. Accordingly, we determine that the trial court properly reduced the jury's verdict to align with Maryland's cap on noneconomic damages.

To summarize, we reject Janssen's sufficiency claim. With respect to the punitive damages issue, we remand so that Mr. Murray may develop an individual record pertaining to the unique conflict-of-law principles relevant to his case. Last, we agree that Maryland's cap on noneconomic damages applies to limit Mr. Murray's award.

Judgment affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. Jurisdiction relinquished.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 2/20/2018*